UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ANNE HARDISON, as personal representative
of the estate of Samuel Wayne Lerch Jr.,

       Plaintiff,                             Civil Action No. 19-CV-13503

vs.                                      HON. BERNARD A. FRIEDMAN

ASPLUNDH CONSTRUCTION
CORPORATION, et al.,

       Defendants.
_____/

## OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

This matter is presently before the Court on defendants' motion for summary judgment [docket entry 33]. Plaintiff has responded and defendants have replied. Pursuant to E.D. Mich. LR 7.1(f)(2), the Court shall decide the motion without a hearing.

This is a worker's compensation and intentional tort case. Plaintiff, the widow of decedent Samuel Wayne Lerch Jr., filed suit against UtiliCon Solutions, LLC ("UtiliCon") and its subsidiary Asplundh Construction, LLC ("Asplundh") (collectively, "defendants"), as the personal representative and administratrix of decedent's estate. *See* Second Am. Compl. ("SAC") ¶¶ 1-3.

Plaintiff alleges that decedent was employed as a journeyman lineman by Asplundh, which had a contract with DTE Energy "to perform construction and maintenance activities associated with DTE Energy's electrical circuits, including the construction and deconstruction of overhead power lines." *Id*. ¶¶ 6-7. Pursuant to this contract, on July 19, 2017, "decedent was assigned the task of removing an existing pole transformer and re-installing it on [a] new utility pole." *Id*. ¶ 8. Plaintiff states that after removing the transformer from the old pole, decedent

noticed that "the span guy wire he was installing [on the new pole] was on the wrong side of the

high voltage secondary wire." *Id.* ¶¶ 11-10.  Plaintiff goes on to allege that

> decedent immediately boomed down and notified his foreman, Dave
> Edgerton, of the situation he discovered with the span guy wire. At
> this point, decedent's supervisor devised the manner and method by
> which to fish the span guy wire over existing phone drops.
> Tragically, the plan devised by Asplundh Construction LLC
> supervision:
>
>> a. Required decedent to perform his assigned tasks
>> without required personal protective equipment
>> (PPE);
>>
>> b. Required decedent to perform his assigned tasks in
>> close proximity to energized conductors without use
>> of required insulation devices over and around these
>> energized conductors;
>>
>> c. Required decedent to perform his assigned tasks
>> operating a bucket for which he lacked the required
>> permit and training;
>>
>> d. Required decedent to perform his assigned tasks
>> operating a bucket in close proximity to energized
>> conductors without a spotter assigned to monitor the
>> clearance between the bucket and the energized
>> conductors;
>>
>> e. Required decedent to perform his assigned tasks in
>> direct contravention of industry, federal and state
>> workplace safety rules and regulations specifically
>> applicable to those tasks; and,
>>
>> f. Required decedent to perform his assigned tasks in
>> direct contravention of the safe workplace policies
>> and procedures of the SafeProduction® program
>> promulgated by the defendant Utilicon and made
>> applicable to its subsidiaries, including Asplundh
>> Construction, LLC.

*Id.* ¶ 11.  Because of these missteps, plaintiff alleges, decedent was fatally electrocuted when his

right shoulder "made contact with a completely unprotected 7,620 volt distribution line" while performing the assigned task. *See id*. ¶¶ 13-16.

Plaintiff's SAC raises two claims: (1) an intentional tort claim against Asplundh for knowing and/or intentional acts or omissions that allegedly led to decedent's death, *see id.* ¶¶ 17-20; and (2) a negligence claim against UtiliCon for allegedly failing to uphold its duty "to monitor the implementation and compliance of its subsidiaries with its SafeProduction® program in such a manner that no supervisor with any subsidiary would be either poorly trained enough or would exhibit such disregard for workplace safety as to direct the activities which caused decedent's death." *Id*. ¶¶ 22.

In the instant motion, defendants seek summary judgment on both claims and argue that "[t]his unfortunate incident is an isolated one, caused by Decedent[']s own actions." Defs.' Br. at 1. Defendants contend that plaintiff's claims fail for four reasons:

> • First, Plaintiff cannot establish an exception to the exclusive remedy under the Worker's Compensation Disability Act ("WCDA");
>
> • Second, there is no evidence that [Asplundh] had actual knowledge that an injury was certain to occur and that it willfully disregarded that knowledge;
>
> • Third, UtiliCon is a holding company that does not exert any control over [Asplundh]; and
>
> • Fourth, there is no evidence that UtiliCon negligently supervised [Asplundh].

*Id*.

> Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of showing "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325

(1986).  A genuine dispute of material fact exists if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). In applying the summary judgment standard, the court must review all materials supplied, including pleadings, in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

*United States v. White*, No. 17-6022, 2018 WL 4215614, at *2 (6th Cir. July 11, 2018).  Having reviewed the parties' briefs and exhibits, the Court concludes that defendants are entitled to summary judgment for the reasons stated below.

### I. Intentional Tort Claim against Defendant Asplundh

Defendants state that following decedent's death, "Plaintiff appropriately submitted a claim for benefits under the WCDA," which was approved.  Defs.' Br. at 10-11, *see* Defs.' Ex. T ("Plaintiff's Application for WCDA Benefits").  Defendants note that as a result of the WCDA claim, "Plaintiff continues to receive benefits in the amount of $482.81 weekly. She will receive these benefits of a total of 500 weeks."  Defs.' Br. at 11.  Additionally, plaintiff "received a $6,000.00 funeral benefit . . . and any Beaumont Hospital bills related to the incident were paid as well."  *Id*.  Defendants argue that "the benefits provided by the WCDA are the sole remedy for employees to recover from their employers when the employee sustains work-related injuries . . . [unless] the employee can show that the employer committed an intentional tort."  *Id*. at 13 (citing MICH. COMP. LAWS § 418.131(1)).  Defendants add that "to recover under the intentional tort exception of the WCDA, a plaintiff must prove that his injury was the result of the employer's deliberate act or omission and that the employer specifically intended an injury."  *Id*. at 14 (citing § 418.131(1)).  The employer's intention can be established via direct evidence of intent to injure or circumstantial evidence that the employer had "actual knowledge that an injury [was] certain to

occur" and willfully disregarded that knowledge. *Id.* (citing  *Travis v. Dreis & Krump Mfg. Co.*, 551 N.W.2d 132, 143 (Mich. 1996)).

Defendants contend that "Plaintiff cannot establish that Decedent's death was the result of [Asplundh's] deliberate act or conscious failure to act," *id.* at 16, nor can she "establish that [Asplundh] had actual knowledge that an injury was certain to occur and willfully disregarded that knowledge." *Id.*  Defendants first note that decedent had "approximately thirteen (13) years of experience as a lineman at the time of the incident," *id.* at 3, and that as a member of the International Brotherhood of Electrical Workers ("IBEW") Local Union 17, he was provided relevant training that supplemented the standard apprenticeship and examination requirements. *See id.* at 3-5. Decedent's training allegedly included an "education course titled 'Insulate & Isolate' . . . on best practices for each individual to insulate and isolate himself from electrical hazards," as well as a training course "specifically on personal protection equipment, safety, and line of fire." *Id.* (citing Defs.' Exs. H, F).

Defendants add that "[i]n addition to his extensive training, Decedent was also required to follow [Asplundh's] safety policies," contained in the company's 200-page Safe Work Practices Manual.  *Id.* at 5 (citing Defs.' Ex. I ("Safe Work Practices Manual" excerpts)). Defendants state that the safety manual provides specific guidance as to PPE and that "it is uncontested that Decedent was issued the following PPE by [Asplundh]:  Eye and Face Protection; Head Protection; Hand Protection; Hearing Protection; Foot Protection; [Flame Resistant] Apparel; Rubber Personal Protective Equipment; [and] Rubber Goods (Rubber Blankets and Line Hose)." *Id.* at 6-7 (citing Defs.' Ex. J ("Email Confirming List of PPE")).  Further, an investigation conducted by the Michigan Occupational Safety and Health Administration ("MIOSHA") found that

"there was proper employer-furnished PPE at the scene of the incident," including that which was in decedent's possession. *See id.* at 7 (citing Defs.' Exs. K ("Photographs Depicting Decedent's PPE"), L ("George Pushies Oct. 17, 2018 Dep. Tr.")). Finally, defendants contend that Asplundh's safety measures, including frequent on-site job observations and PPE policies, go above and beyond those required by MIOSHA or IBEW Local Union 17. *See id.* at 7-8.

As to the safety measures on the date of the incident, defendants state that crew leader Edgerton "led a ten- to fifteen-minute job briefing," "[t]he crew discussed the plans for installing the pole and how they would go about the installation," "Decedent had previously attached the guy wire to the new wooden pole without incident," and "no designated ground observer should have been necessary" if the task had been completed in accord with Edgerton's instructions. *Id.* at 9. However, defendants argue that

> Decedent exercised his own discretion in the minutes leading up to his electrocution. Immediately before the incident, the crew discussed how to move the guy wire for proper installation. After the guy wire was secure, the conductor, wires, and transformer would be set on the new pole. The ground wire would have been the final . . . step of installation. However, Decedent inexplicably took the ground wire in his bare left hand and raised his bucket into the primary zone.
>
> Neither [Asplundh] nor its management could have known that Decedent would disregard the instructions from his crew leader. Instead of working on the guy wire, Decedent unilaterally decided to take the ground wire up the pole. He unilaterally decided to take the ground wire up the pole without his PPE on.[1] He unilaterally decided to raise the bucket into the primary zone without a designated ground observer. Decedent was not directed to do any of these things. No one could predict that Decedent would exercise his discretion in this manner and disregarding his crew leader's instructions.

_____

[1] Defendants state that "[h]ad Decedent not had the ground wire in his hand, he would have been like a 'bird on a wire' and the electrical contact would not have killed him." Defs.' Br. at 20 n.3 (citing Defs.' Ex. V ("David Edgerton Dep. Tr.")).

*Id*. at 19-20 (citations and original footnotes omitted).

In response, plaintiff argues that decedent was following crew leader Edgerton's instructions, that "injury or death was certain to occur when an energized 13,200/7,600 V power line was worked on without insulated rubber gloves and sleeves or without insulated rubber gloves and insulated line hose," and that "[d]espite having all of this knowledge and being aware of exactly what Sam Lerch was doing, Edgerton made a knowing and conscious decision to allow work to be performed and work to carry on without the required protective barriers with nobody watching him." Pl.'s Resp. Br. at 8 (internal quotation marks and citations omitted).  Plaintiff contends that Asplundh is ultimately to blame because it "allowed [Edgerton] to be in a position without giving [him] the training and education, the knowledge [he] needed to make sure all the laws were complied with and all the members of [his] crew were safe."  *Id*. at 9 (internal quotation marks omitted) (quoting Pl.'s Ex. V ("David Edgerton Dep. Tr.")).

Plaintiff argues that the Court should deny defendants' motion for summary judgment as to this claim because "there are a plethora of questions of material fact outstanding."  *Id*. at 15. This includes questions as to Asplundh's knowledge or intent, the likelihood of injury under the circumstances, "[w]hether Edgerton knew that Sam Lerch was not wearing appropriate PPE," and "[w]hether Edgerton conducted a daily job briefing on July 19, 2017."  *Id*. at 15, 18-23.

Viewing the evidence in the light most favorable to plaintiff, the Court concludes that Asplundh did not commit an intentional tort as defined by § 418.131(1).  Plaintiff is thus barred from seeking a remedy beyond that which was already provided under the WCDA.

Section 418.131(1) states:

The right to the recovery of benefits as provided in this act shall be the employee's exclusive remedy against the employer for a personal

> injury or occupational disease.  The only exception to this exclusive remedy is an intentional tort.  An intentional tort shall exist only when an employee is injured as a result of a deliberate act of the employer and the employer specifically intended an injury.  An employer shall be deemed to have intended to injure if the employer had actual knowledge that an injury was certain to occur and willfully disregarded that knowledge.  The issue of whether an act was an intentional tort shall be a question of law for the court.

The facts of this case fail to demonstrate that defendants possessed "actual knowledge" that decedent's injury was certain to occur.[2]  The Michigan Supreme Court has explained that § 418.131(1)'s "actual knowledge" standard was codified in order to fill a gap in Michigan's workers compensation framework regarding intentional tort liability.  *Travis*, 551 N.W.2d at 138.  This gap was brought to the fore by *Beauchamp v. Dow Chem. Co.*, 427 N.W.2d 882 (Mich. 1986), in which plaintiff "was exposed at work to the chemical agent orange and, as a result, suffered physical and mental injuries.  He sued his employer, alleging in part that his employer intentionally misrepresented and fraudulently concealed potential danger."  *Travis*, 551 N.W.2d at 138 (internal quotation marks omitted).  The *Beauchamp* court determined that intentional torts should not fall within the WCDA's exclusivity provision and adopted a definition of intentionality that included acts taken with "substantial certainty" that injury would occur as a result.  *Id*.  Recognizing the need to allow for civil damages in cases of intentional tort, and seeking to clarify and narrow the court-created exception to the WCDA, the state legislature adopted the statute's current language through a 1987 amendment.  *See id*. at 139-40.  Regarding the newly codified exclusivity exception,

> [t]he Senate Fiscal Agency Analysis explained that the bill not only

---

[2] Plaintiff does not contend that Asplundh injured decedent deliberately.  Consequently, the Court focuses its analysis on the "actual knowledge" standard under § 418.131(1).

> would allow the pursuit of civil claims as an alternative to the workers' compensation system in *extreme cases* (i.e., intentional injury), but also would ensure the workability and usefulness of the system by specifying that the Act would be an exclusive remedy in all other situations.

*Id*. at 140 (emphasis in original) (internal quotation marks omitted).

The Michigan Supreme Court has held that the amendment's "actual knowledge" language amounts to

> a legislative recognition of a limited class of cases in which liability is possible despite the absence of a classic intentional tort and as a means of inferring an employer's intent to injure from the surrounding circumstances in those cases. In other words, the [actual knowledge standard] will be employed when there is no direct evidence of intent to injure, and intent must be proved with circumstantial evidence. . . .
>
> Because the Legislature was careful to use the term "actual knowledge," and not the less specific word "knowledge," we determine that the Legislature meant that constructive, implied, or imputed knowledge is not enough. Nor is it sufficient to allege that the employer should have known, or had reason to believe, that injury was certain to occur. A plaintiff may establish a corporate employer's actual knowledge by showing that a supervisory or managerial employee had actual knowledge that an injury would follow from what the employer deliberately did or did not do.

*Id.* at 143 (internal citations omitted).

As to how "certain" the injury must be under § 418.131(1), the Michigan Supreme Court has explained that "[t]he legislative history requires us to interpret 'certain to occur' as setting forth an extremely high standard. When an injury is 'certain' to occur, no doubt exists with regard to whether it will occur." *Id*. "Moreover, conclusory statements by experts are insufficient to allege the certainty of injury contemplated by the Legislature." *Id*. Further, "the employer [must] be aware that injury is certain to occur from what the actor does." *Id*. at 144. Employer-initiated

9

precautionary measures, such as warnings, training, or repairs, further remove injury from the "realm of certainty."[3] *Id.*

The Michigan Supreme Court has applied the "actual knowledge" and "certain injury" standards of § 418.131(1) on various occasions. Plaintiff likens the instant case to *Golec v. Metal Exch. Corp.*, 208 N.W.2d 756 (Mich. Ct. App. 1995), while defendants liken it to *Bagby v. Detroit Edison Co.*, 865 N.W.2d 59 (Mich. Ct. App. 2014). The plaintiff in *Golec* was a furnace operator at an aluminum smelting factory who did not have access to and/or was not supplied with adequate protective equipment. *Travis*, 551 N.W.2d at 136 (noting that plaintiff was allegedly only provided a helmet and a mask).[4] On the day of the incident, plaintiff, plaintiff's shift leader, and the shift leader's supervisor were all aware of certain hazardous conditions that caused the furnace to emit minor explosions, including one that burned plaintiff's hand that very day. *Id.* at 137. After raising the issue of the explosions with his superiors, plaintiff was ordered to return to work only to be severely burned by a "huge explosion from the furnace." *Id.* The Michigan Supreme Court held that Golec's employer could not prevail in its motion for summary judgment because "plaintiff

---

[3] The Michigan Supreme Court has stated that

> [w]hen an employer subjects an employee to a continuously operative dangerous condition that it knows will cause an injury, yet refrains from informing the employee about the dangerous condition so that he is unable to take steps to keep from being injured, a factfinder may conclude that the employer had knowledge that an injury is certain to occur.

*Travis*, 551 N.W.2d at 145. Under such circumstances, informing the employee about the dangerous condition would reduce the likelihood of injury.

[4] On appeal to the Michigan Supreme Court, *Golec* was consolidated with *Travis v. Dreis & Krump Mfg. Co.*, 523 N.W.2d 818 (Mich. Ct. App. 1994).

had established a genuine issue of material fact with respect to whether defendant . . . committed an intentional tort." *Id.* at 147.  In reaching this conclusion, the court noted that if the cause of the explosion was "plaintiff's loading technique" or if defendant had instructed plaintiff regarding the proper method for loading scrap metal so as to avoid an explosion, "then defendant must prevail." *Id.* at 148.

A different outcome was reached in *Bagby*. In that case, plaintiff was fatally electrocuted during the course of employment.  The Michigan Court of Appeals upheld the trial court's decision to grant summary disposition for the employer, stating that "[e]ven assuming arguendo that plaintiff established a deliberate act or conscious failure to act, she has failed to provide evidence that defendant had actual knowledge that an injury was certain to occur and willfully disregarded that knowledge." *Bagby*, 865 N.W.2d at 62.  The court found that it would be "speculation to conclude that the failure to conduct [a prejob] briefing would result in Bagby's death[, and] [i]t is even more speculative to conclude that . . . [decedent's] supervisor[] knew that the failure to conduct the prejob briefing would result in certain injury." *Id.* at 63 (reaching the same conclusion as to decedent's allegedly inadequate qualifications for the task at issue).  Further, the court emphasized that

> plaintiff cannot show that defendant had actual knowledge that an injury was certain to occur because Bagby had many opportunities to exercise his own discretion.  To be known and certain, an injury must spring directly from the employee's duties and the employee cannot have had the chance to exercise individual volition.  An employer cannot know that an injury is certain to occur when the employee makes a decision to act or not act in the presence of a known risk because the employer cannot know in advance what the employee's reaction will be and what steps he will take.

*Id.* at 63-64 (internal quotation marks and citation omitted).

The instant case is far more akin to *Bagby* than it is to *Golec*.  Plaintiff does not dispute that decedent had years of experience as a journeyman lineman, that Asplundh provided employees with clear safety protocols and various items of PPE, or that it was decedent's own discretionary decision to not wear his PPE on the day of the incident.[5]  Further, as in *Bagby*, the link between decedent's fatal injury and the allegedly inadequate prejob briefing and/or his allegedly inadequate qualifications for the task he was assigned is too speculative to satisfy the WCDA's rigorous causation requirement.  Plaintiff emphasizes the dangers inherent in working on energized wires, *see* Pl.'s Resp. Br. at 6, but "[a]n employer's knowledge of general risks is insufficient to establish an intentional tort." *Herman v. City of Detroit*, 690 N.W.2d 71, 77 (Mich. Ct. App. 2004).  Additionally, given decedent's training and experience in this field, he plainly was aware of the dangers.  Plaintiff essentially contends that Edgerton should have intervened, and arguably it was negligent for Edgerton not to have done so under the circumstances.  Nonetheless, the facts alleged

_____

[5] The parties disagree as to the dangerousness and/or discretionary nature of some of decedent's actions on the day of the incident.  For example, plaintiff states that

> Asplundh makes much of Mr. Lerch holding a ground wire in his hand when the incident occurred, as Egerton purportedly did not instruct Mr. Lerch to do so.  However, the ground wire is a red herring; Mr. Lerch was instructed to elevate his bucket by Edgerton with no IPE or PPE in place, facts Edgerton knew when he made the order.  Edgerton also readily admits that placement of the ground wire was a routine part of the job they were doing.  As testified to by MIOSHA's Georg[]e Pushies, it would not matter whether Sam Lerch had a "ground wire or a ham sandwich in his hand" if the proper PPE and IPE were in place.

Pl.'s Resp. Br. at 19 n.4.  There is also some ambiguity as to Edgerton's exact instructions and whether it was decedent's own decision to raise the bucket into the more dangerous "minimum approach distance" (or "primary zone").  *See id*. at 7 n.2; Defs.' Reply Br. at 4-5.  However, the parties do not dispute that serious injury would have been avoided had decedent decided to wear his employer-provided PPE.  *See* Pl.'s Resp. Br. at 8; Defs.' Reply Br. at 4.

fail to meet the very demanding standard of the § 418.131(1) exception to the WCDA's otherwise exclusive remedy. *See Barnes v. Sun Chem. Corp.*, 657 F. App'x 469, 475 (6th Cir. 2016) (holding "that some supervisors may have known employees were 'bypassing' the safety measures . . . does not suffice to establish an intentional tort"). Decedent was equipped with the skills, knowledge, and equipment to conduct his job safely on July 19, 2017. The facts of this case fail to demonstrate that defendant "had actual knowledge that an injury was certain to occur and willfully disregarded that knowledge."[6] Section 418.131(1). Rather, as in *Herman*, "[t]he facts demonstrate that decedent's death was the result of decedent's momentary and tragic lapse in judgment." *Herman*, 690 N.W.2d at 77. For these reasons, defendants' motion for summary judgment as to this claim is granted.

## II. Negligence Claim against Defendant UtiliCon

As to plaintiff's claim that UtiliCon's negligent implementation and oversight of its SafeProduction® program caused decedent's injuries, defendants contend that (1) "because Plaintiff cannot establish an intentional tort under which [Asplundh] would be liable, UtilitCon cannot be held vicariously liable under any legal theory; and (2) "UtiliCon is a holding company that does not exert any control over [Asplundh] or its policies or procedures." Defs.' Br. at 22. In support of this latter argument, defendants state that

> Gregory Holman, a Senior Vice President of UtiliCon, testified that the SafeProduction® policies are developed by UtiliCon's subsidiaries as a group. Then the subsidiaries have the option to utilize that "slogan" and the developed policies. It is within the subsidiaries' sole discretion whether to adopt those policies. As such, UtiliCon cannot have a duty to ensure [Asplundh] enforces the policies it elects to adopt.

---

[6] Because the Court finds that the facts of this case do not support the conclusion that Asplundh had actual knowledge that certain injury would result from its acts or omissions, there is no need to address whether defendant wilfully disregarded this knowledge.

*Id*. (citations omitted) (citing Defs.' Ex. W (" Gregory Holman Dep. Tr.")).

In response, plaintiff argues that UtiliCon is not "some amorphous 'holding company,'" rather, "[i]t has officers, office space and is based specifically out of Willow Grove, Pennsylvania."  Pl.'s Resp. Br. at 24.  Plaintiff contends that

> UtiliCon is a support company which offers services to Asplundh and its sister companies . . . ***specifically*** includ[ing] safety consulting. . . .  It also developed, with input from subsidiaries, the Safe Work Practices Manual that Asplundh adopted and adhered to.  Utilicon immersed itself in the minutia of the safety procedures of Asplundh and its sister entities.  Utilicon mandated adherence to those policies.

*Id*. at 23 (emphasis in original) (citations omitted).  Plaintiff adds that "when a company undertakes the responsibility of developing, implementing and enforcing a safety program, society has an interest in that company being held to reasonably prudent standards in order to protect the individuals relying on that program to keep them safe."  *Id*. at 26.

"Under Michigan law, a plaintiff must prove the following four elements in order to establish a prima facie case of negligence: 1) a duty owed by the defendant to the plaintiff; 2) a breach of that duty; 3) causation; and 4) damages."  *Phillips v. Nw. Airlines Corp.*, 99 F. App'x 862, 864 (6th Cir. 2004).  Having reviewed the briefs and exhibits, the Court concludes that plaintiff has failed to present a prima facie case of negligence as to UtiliCon.

In support of this claim, plaintiff cites former Asplundh Tree Services, LLC employee Anthony Mangabat's deposition testimony confirming that "Asplundh or UtiliCon . . . have more stringent safety policies" than those required by certain unions and that supervisors are required to enforce these policies.  Pl.'s Ex. C, at 52-53.  Plaintiff also cites the deposition testimony of Robert Maryyanek, Director of Safety for Asplundh, who agreed that UtiliCon "has a role in putting [the safety program] together and giving it out to [their subsidiaries] for consistency's sake," Pl.'s Ex.

14

B, at 15-16, and that UtiliCon had to be consulted before Asplundh could make changes to its safety manual. *Id*. at 17.  However, the evidence presented does not support plaintiff's claims that UtiliCon "developed" the relevant safety procedures, *see* Pl.'s Resp. Br. at 25, "mandated adherence" to these procedures, or "immersed itself in the minutia" of its subsidiaries' implementation of these procedures.  *See id*. at 23.  While, based on this evidence, UtiliCon was clearly aware of its subsidiaries' safety policies, plaintiff has failed to show that UtiliCon had a duty to enforce the safety policies of its subsidiaries or that such a duty was owed to subsidiary employees, including decedent.  The Court shall thus grant defendants' motion for summary judgment as to this claim. Accordingly,

IT IS ORDERED that defendants' motion for summary judgment is granted..


s/Bernard A. Friedman
BERNARD A. FRIEDMAN
Dated:  April 27, 2021                                SENIOR UNITED STATES DISTRICT JUDGE
        Detroit, Michigan

15